*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BP PIPELINES (ALASKA) INC., CONOCOPHILLIPS TRANSPORTATION ALASKA, INC., EXXONMOBIL PIPELINE COMPANY, KOCH ALASKA PIPELINE COMPANY, LLC, UNOCAL PIPELINE COMPANY, and ALYESKA PIPELINE SERVICE COMPANY, | ) ) ) ) ) ) ) ) ) ) | Supreme Court Nos. S-14095/14116/14125<br><br>Superior Court No. 3AN-06-08446 CI<br><br>O P I N I O N<br><br>No. 6867 – February 19, 2014 |
| Appellants and Cross-Appellees, | ) ) ) | |
| v. | ) ) | |
| STATE OF ALASKA, DEPARTMENT OF REVENUE, and STATE ASSESSMENT REVIEW BOARD, | ) ) ) ) ) | |
| Appellees and Cross-Appellees, | ) ) ) ) | |
| NORTH SLOPE BOROUGH, FAIRBANKS NORTH STAR BOROUGH, and CITY OF VALDEZ, | ) ) ) ) ) | |
| Appellees, Cross-Appellants, and Cross-Appellees. | ) ) ) ) | |
| | ) | |

| CITY OF VALDEZ, | ) |
| | ) |
| Cross-Appellant/Appellee, | ) |
| | ) |
| v. | ) |
| | ) |
| BP PIPELINES (ALASKA) INC., | ) |
| CONOCOPHILLIPS | ) |
| TRANSPORTATION ALASKA, | ) |
| INC., EXXONMOBIL PIPELINE | ) |
| COMPANY, KOCH ALASKA | ) |
| PIPELINE COMPANY, LLC, | ) |
| UNOCAL PIPELINE COMPANY, | ) |
| ALYESKA PIPELINE SERVICE | ) |
| COMPANY, STATE OF ALASKA | ) |
| DEPARTMENT OF REVENUE, | ) |
| STATE ASSESSMENT REVIEW | ) |
| BOARD, NORTH SLOPE | ) |
| BOROUGH, FAIRBANKS NORTH | ) |
| STAR BOROUGH, | ) |
| | ) |
| Cross-Appellees/Appellants. | ) |
| | ) |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Sharon Gleason, Judge.

Appearances: Leon T. Vance, Faulkner Banfield, P.C., Juneau, Alexander O. Bryner, Feldman Orlansky & Sanders, Anchorage, Michael R. Garatoni, Garatoni Breen & Malone, Inc., San Antonio, Texas, for Appellants/Cross-Appellees. William Walker, Craig Richards, Sara Rishko, Walker & Levesque, LLC, Valdez, for Cross-Appellant/Appellee City of Valdez. Robert M. Johnson, Law Office of Robert M. Johnson, Anchorage, and Kenneth J. Diemer, Assistant Attorney General, Anchorage, and Richard Svobodny, Acting Attorney General, Juneau, for Appellees/Cross-Appellees State of Alaska Department of Revenue and State Assessment Review Board. Mauri Long and Jessica Dillon, Dillon &

Findley, P.C., Anchorage, for Appellee North Slope Borough. Robin Brena and Laura S. Gould, Brena, Bell & Clarkson, P.C., Anchorage, for Appellee Fairbanks North Star Borough.

Before: Fabe, Chief Justice, Winfree, Stowers, and Maassen, Justices, and Senior Justice Matthews.[*] [Carpeneti, Justice, not participating.]

FABE, Chief Justice.
WINFREE, Justice, with whom STOWERS, Justice, joins, dissenting in part.

## I.    INTRODUCTION

This case involves the assessed value of the Trans-Alaska Pipeline System for property tax purposes. On appeal from the Alaska State Department of Revenue and the State Assessment Review Board, the superior court conducted a trial de novo to assess the value of the pipeline by calculating its replacement cost and then accounting for depreciation. The parties dispute the method used to assess the pipeline's value as well as the specific deductions made for functional and economic obsolescence. We affirm the superior court's valuation.

## II.    FACTS AND PROCEEDINGS

The Trans-Alaska Pipeline System is an 800-mile-long oil pipeline that connects oil reserves in Alaska's North Slope to a shipping terminal in the City of

---

[*]      Sitting by assignment made under article IV, section 11 of the Alaska Constitution and Alaska Administrative Rule 23(a).

Valdez.  This appeal involves a dispute between the Owners[1] of the pipeline and government entities about the assessed value of the pipeline for tax purposes.

Alaskan municipalities may levy and collect a tax on oil and gas property, including pipeline property, but the State Department of Revenue assesses the "full and true value" of that property.[2]  Alaska Statute 43.56.060 controls the Department of Revenue's assessment.[3]  A party may appeal the Department of Revenue's valuation to the five-member State Assessment Review Board.[4]  In turn, the superior court reviews an appeal of the Assessment Review Board's decision in a trial de novo.[5]  In this case, the Owners of the Trans-Alaska Pipeline System appeal the superior court's valuation of the pipeline for 2006 property tax assessment purposes.

In 2006 the Department of Revenue valued all pipelines in Alaska through a mass appraisal process, meaning that it used "standardized approaches and standardized adjustments" for them all.  When deciding how to assess these pipelines, the Department of Revenue considered the three primary methods for calculating a property's value:  (1) the income method, measuring the property's earning power

---

[1]  The Owners and their ownership percentages of the Trans-Alaska Pipeline System are BP Pipelines (Alaska) Inc. (46.9%), ConocoPhillips Transportation Alaska, Inc. (28.3%), ExxonMobil Pipeline Company (20.3%), Koch Alaska Pipeline Company (3.1%), and Unocal Pipeline Company (1.4%).  The Alyeska Pipeline Service Company, also an appellant, "is the operating agent for the Owners and operates [the Trans-Alaska Pipeline System], and additionally holds title to some of the taxable property that is part of the 2006 [Trans-Alaska Pipeline System] assessment."

[2]  AS 29.45.080(b).

[3]  AS 43.56.060(e).

[4]  AS 43.56.120.

[5]  AS 43.56.130.

through the capitalization of its income; (2) the cost method, measuring the cost of acquiring a substitute property of equivalent utility; and (3) the sales comparison method, analyzing the sales price of comparable property. The Department of Revenue decided that the most reliable method was to estimate the replacement cost of the pipeline less depreciation. After conducting this "replacement cost new" analysis for the Trans-Alaska Pipeline System, the Department of Revenue's assessor, Randy Hoffbeck, determined that the pipeline's 2006 value was $3.641 billion.

Both the Owners and the Municipalities[6] seeking to levy and collect tax on the Trans-Alaska Pipeline System appealed the Department of Revenue's valuation to the State Assessment Review Board. After a three-day hearing in May 2006, the Assessment Review Board rejected the Owners' argument that the pipeline should be valued using the income approach rather than the cost approach. The Assessment Review Board agreed with the Municipalities that the Department of Revenue made certain inappropriate deductions when assessing the value of the property. Thus the Assessment Review Board raised the valuation of the Trans-Alaska Pipeline System to $4.3062718 billion.

The Owners and Municipalities appealed the Assessment Review Board's decision to the superior court. The Owners argued that the 2006 assessed value of the Trans-Alaska Pipeline System should be reduced to $850 million, and the Municipalities argued that the assessed value should be raised to $11.570 billion. After a five-week trial de novo in August and September of 2009, Superior Court Judge Sharon Gleason issued a decision in May 2010 finding the value to be $9.98 billion for the 2006 tax year. The Owners, Municipalities, and the Department of Revenue all filed motions for

_____

[6]     The Municipalities are the City of Valdez, the Fairbanks North Star Borough, and the North Slope Borough.

reconsideration. The superior court issued an amended decision upon reconsideration in October 2010.[7] That decision forms the basis of this appeal.

The superior court determined that the Department of Revenue and the State Assessment Review Board's reliance on the cost approach to valuation, rather than an income approach as proposed by the Owners, was not improper, unsupported by the record, or fundamentally wrong. But the superior court agreed with the Municipalities that the Assessment Review Board's valuation was improper in certain respects.

The superior court found the Municipalities' cost study to be more credible and accurate than any of the other cost studies in the record, including that presented by the Owners and that relied upon by the Department of Revenue and the Assessment Review Board.[8] Based on this study, the superior court determined that the valuation's scaling adjustment for excess capacity should be larger and should be characterized as economic or external rather than functional obsolescence. The superior court arrived at a final valuation of $9.977934 billion for the 2006 tax year, more than twice the Assessment Review Board's valuation.

In its final judgment, the superior court directed the Department of Revenue to issue a supplemental certified assessment roll based on the superior court's valuation of the Trans-Alaska Pipeline System that would form the basis of the supplemental taxes owed by the Owners. The superior court ruled that interest owed on the supplemental taxes would begin to run on June 30, 2006, when the taxes would have been due in 2006.

---

[7]    The amended decision clarified or revised various factual findings and made "editing/errata type corrections." Most significantly, the superior court remanded the case to the Department of Revenue instead of the Assessment Review Board. The assessed value of the pipeline remained the same.

[8]    The Owners do not appeal the superior court's decision to rely on the Municipalities' cost study.

-6-                                                                        6867

The Owners appeal the superior court's decision, arguing that the pipeline should have been assessed at fair market value as measured by tariff income rather than use value as measured by replacement cost. The Owners also argue that the superior court's assessment improperly reached non-taxable property, that the superior court misconstrued a settlement agreement, and that the superior court's imposition of interest dating from 2006 was in error. The Municipalities cross-appeal, arguing that the superior court erred in applying a scaling deduction for economic obsolescence.

## III. STANDARD OF REVIEW

When parties appeal the superior court's review of an administrative agency's decision in a trial de novo, we review only the superior court's decision, not that of the administrative agency.[9] We review the superior court's factual findings under the clearly erroneous standard and will not overturn a factual finding unless "left with the firm and definite conviction on the entire record that a mistake has been made."[10] On questions of law, we are not bound by the lower court's decision.[11] "Our duty is to adopt the rule of law that is most persuasive in light of precedent, reason, and policy."[12]

---

[9] *City of Nome v. Catholic Bishop of N. Alaska*, 707 P.2d 870, 875 (Alaska 1985) (citing *Kott v. City of Fairbanks*, 661 P.2d 177, 180 n.1 (Alaska 1983)).

[10] *Id.* at 876 (quoting *Stanton v. Fuchs*, 660 P.2d 1197, 1198 (Alaska 1983)) (applying the clearly erroneous standard to the superior court's findings of fact when reviewing the superior court's de novo review of an administrative agency decision).

[11] *Guin v. Ha*, 591 P.2d 1281, 1284 n.6 (Alaska 1979).

[12] *Id.*

## IV. DISCUSSION

### A. The Superior Court Did Not Err By Assessing The Use Value Of The Trans-Alaska Pipeline System.

#### 1. Alaska Statute 43.56.060 does not require pipeline property to be assessed at its "fair market value."

The Alaska Constitution provides that "[s]tandards for appraisal of all property assessed by the State . . . shall be prescribed by law."[13] Consistent with this commandment, AS 43.56.060 provides that the Department of Revenue shall assess "property used . . . for the pipeline transportation of gas or unrefined oil or for the production of gas or unrefined oil at its *full and true value* as of January 1 of the assessment year."[14] It also specifies that the full and true value of pipeline property is "determined . . . with due regard to the economic value of the property based on the estimated life of the proven reserves of gas or unrefined oil then technically, economically, and legally deliverable into the transportation facility."[15] The parties dispute the meaning of this "full and true value" appraisal standard. The Owners contend that the "full and true value" of the pipeline can only be assessed by looking at its fair market value. The Municipalities agree with the Department of Revenue and the Assessment Review Board that "full and true value" may be measured by any one of several assessment standards, including fair market value or use value.

The superior court determined that the Department of Revenue and the State Assessment Review Board assessed the value of the Trans-Alaska Pipeline System by looking at the "use value" of the pipeline, defined as "the value that [the pipeline] has

---

[13]  Alaska Const. art. IX, § 3.

[14]  AS 43.56.060(a) (emphasis added).

[15]  AS 43.56.060(e)(2).

for its specific use in an integrated system in transporting [Alaska North Slope] products from the Owners' affiliates from the Alaska North Slope to market." The superior court found that the use value premise had "not been demonstrated to constitute a fundamentally wrong principle of valuation." The superior court found that "economic value" has "no generally accepted definition in the appraisal profession," and the Owners do not dispute this finding. The superior court further concluded that "neither the term 'full and true value' nor the term 'economic value' as used in [AS 43.56.060(e)] mandates, as a matter of law, the exclusive reliance on the regulated tariff income stream to derive a value of [the Trans-Alaska Pipeline System] for property tax purposes."

The Owners argue on appeal that the legislature intended the phrase "full and true value" to mean "fair market value" and contend that market value should be assessed by calculating the value of the pipeline's income from tariffs.

*The Appraisal of Real Estate* defines "market value" as

> [t]he most probable price, as of a specified date . . . for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.[16]

"Market value" differs from "use value," which "focuses on the value the real estate contributes to the enterprise of which it is a part, without regard to the highest and best use of the property or the monetary amount that might be realized from its sale."

The Owners contend that the superior court erroneously gave the Department of Revenue and the State Assessment Review Board the discretion to select an assessment standard when in fact the statute compels the use of the "fair market value" standard. The Owners' primary argument is that "full and true value" is defined

---

[16] APPRAISAL INST., THE APPRAISAL OF REAL ESTATE 23 (13th ed. 2008).

elsewhere by the legislature as "fair market value," and analyzing the statutory scheme as a whole indicates that "full and true value" should be defined as "fair market value" under AS 43.56.060(e)(2) as well.

Thus the question for this court is whether AS 43.56.060 compels the use of a "fair market value" standard and prohibits the use of a "use value" standard. The plain text and history of AS 43.56.060 indicate that the legislature did not intend for "fair market value" to be the only allowable standard for the assessment of pipeline property.

"When the legislature uses the same term in two closely related statutes, we will normally presume that the legislature intended that term to mean the same thing in both cases."[17] The Owners point out that AS 43.56, which sets the assessment standard for oil and gas property, operates in conjunction with AS 29.45, which allows municipalities to tax property, including oil and gas properties. Alaska Statute 29.45.110(a) defines "full and true value" as "market value," or "the estimated price that the property would bring in an open market and under the then prevailing market conditions in a sale between a willing seller and a willing buyer both conversant with the property and with prevailing general price levels."[18] But AS 29.45.110(a) refers to property that the municipality, not the state, assesses. And that chapter explicitly provides that the full and true value of pipeline property is determined not under AS 29.45, but "under AS 43.56 as assessed by the Department of Revenue."[19] Thus,

---

[17] *Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 906 (Alaska 1987) (quoting *Matanuska-Susitna Borough v. Hammond*, 726 P.2d 166, 180 (Alaska 1986)).

[18] AS 29.45.110(a).

[19] AS 29.45.080(c).

AS 29.45.110's definition of full and true value is not relevant to the assessment standard used by the Department of Revenue.

The Owners note that the legislature also defined "full and true value" as "market value" in certain sections of AS 43.56.060. But AS 43.56.060 defines "full and true value" differently for each type of oil and gas property the statute covers. For exploration property, "full and true value" is defined as "market value," but that definition is explicitly limited to exploration property.[20] The "full and true value" of production property, on the other hand, is "determined . . . on the basis of replacement cost less depreciation based on the economic life of proven reserves."[21] The value of under-construction production and pipeline property in the first year of assessment is measured by "the actual cost incurred or accrued with respect to the property as of the date of assessment."[22] Thus there is no global definition of "full and true value" in AS 43.56.060, and there is no definition of "full and true value" specific to pipeline property.

The legislative history of AS 43.56.060 supports the Municipalities' position that the legislature did not intend "full and true value" to have the uniform meaning of "market value" throughout the property tax statutes. In 1973 the Director of the Alaska Oil and Gas Division testified to the House Finance Committee about the bill that would become AS 43.56.[23] He noted that the phrase "full and true value" was

---

[20]     AS 43.56.060(c) (specifying that "[t]he full and true value of taxable property . . . for use *in the exploration for gas or unrefined oil . . .* is [market value]" (emphasis added)).

[21]     AS 43.56.060(d)(2).

[22]     AS 43.56.060(d)(1), (e)(1).

[23]     Minutes, H. Fin. Comm. Hearing on H.B. 1, 8th Leg., 1st Spec. Sess. 49
(continued...)

"a problem" because there were "many different methods of assessment" and that "he defied a tax assessor to determine 'full and true value.' "[24] The Director then went down the list of types of oil and gas property covered under AS 43.56.060:

> Under Sec. 60 of the Governor's bill, sub-section (a) is a provision for what is assessed. . . . (b) Deals only with exploration equipment, based on market value. . . . (c) Cover[s] production equipment. The tax assessor would check the equipment, old and new, and tax accordingly, using actual cost less depreciation. . . . (d) Pipeline and pipeline equipment. It starts with the actual cost as a basis, but is depreciated on the economic life except in the event the physical life is different.[25]

The Director's testimony indicates that "full and true value" was construed differently for each subsection, that "market value" was thought to be the standard only for exploration property, and that the cost approach was considered to be a definition of "full and true value" distinct from market value.

The testimony of former Attorney General John Havelock also supports the Municipalities' view that "full and true value" is not synonymous with "fair market value."[26] The Attorney General was asked whether it would "make much difference" for production property to be valued at "fair market value" as opposed to the method laid out

---

[23](...continued)
(Oct. 22, 1973) (comments of Homer Burrell, Director, Division of Oil and Gas).

[24]    *Id.* at 49-50.

[25]    *Id.* at 51.

[26]    Minutes, H. Fin. Comm. Hearing on H.B. 1, 8th Leg., 1st Spec. Sess. 21 (Oct. 20, 1973) (comments of John Havelock, Attorney General).

in the draft bill.[27]  Havelock responded that "it would be a considerable change" because "[t]he fair market value method would introduce an element of uncertainty in property that doesn't have a fair market value."[28]  He explained that he "didn't think the fair market value was appropriate" for valuing production property.[29]  While Havelock was referring to production rather than pipeline property, his testimony shows that fair market value was not considered the common standard for valuing all property under AS 43.56.060 and that the standard used for both pipeline and production property was considered distinct from fair market value.

We therefore conclude that the statutory language of AS 43.56.060 does not compel the Department of Revenue to use a fair market valuation standard.  But although the use of a fair market standard is not always required, we must also examine whether the superior court erred in this case by assessing the Trans-Alaska Pipeline System under a use value standard.

### 2. The superior court did not err by applying a use value standard in this case.

The parties dispute whether the Assessment Review Board's decision to evaluate the pipeline under a use value standard implicates agency expertise such that the superior court — and by extension, this court — should treat that decision with additional deference.[30]  We need not answer this question.  After giving due deference

---

[27]     *Id.*

[28]     *Id.*

[29]     *Id.*

[30]     *See Tesoro Alaska Petroleum Co. v. Kenai Pipe Line Co.*, 746 P.2d 896, 903 (Alaska 1987) (noting that the "rational basis test is used where the questions at issue implicate special agency expertise or the determination of fundamental policies (continued...)

-13-                                                      6867

to the superior court's factual findings, we conclude that its decision to apply a use value assessment standard stands on its own merits. The superior court made ample findings to support its conclusion that, because there is no market from which to calculate fair market value for the Trans-Alaska Pipeline System or for shipping capacity on the pipeline, the use value standard was appropriate.

The superior court found that the Trans-Alaska Pipeline System's primary value is its utility in transporting North Slope oil reserves. The court estimated the reserves to be "worth $350 billion, to market." Because "[t]he value of those proven reserves cannot be realized without [the pipeline], as it constitutes the only viable means of transporting [Alaska North Slope] product to market," the superior court ruled that valuing the pipeline based on the market value of its tariff income stream[31] alone would fail to capture its full and true value.

The superior court found that the Trans-Alaska Pipeline System is a limited-market and special-purpose property. A limited-market property is a property that "has relatively few potential buyers at a particular time."[32] The superior court further found that all but one pipeline owner has a corporate affiliate Alaska North Slope oil producer and that there is a limited market for the sale of an individual ownership interest in the Trans-Alaska Pipeline System. Historically when such a sale has taken place, it has included an interest in transporting oil production. The superior court recognized that the three largest owners of the pipeline had a combined 95% ownership

---

[30](...continued)
within the scope of the agency's statutory function").

[31]     Tariff income is revenue generated from charging a tariff to transport oil through the pipeline.

[32]     APPRAISAL INST., *supra* note 16, at 27.

interest in the pipeline and their corporate affiliates had a combined 91.4% share of the estimated Alaska North Slope oil production. Thus the superior court found the production of oil and ownership of the Trans-Alaska Pipeline System to be inextricably linked.

The superior court took into account an affidavit from an economic expert, Adam Jaffe, who had testified for the Owners before the Federal Energy Regulatory Commission in a previous matter. Jaffe testified at trial that the Trans-Alaska Pipeline System was distinct from "most other oil pipelines" because it was "largely a closed system in which the vast majority of business is transacted among affiliated buyers and sellers." Thus the market for the Trans-Alaska Pipeline System is "very different from 'textbook' markets." The superior court noted that while the Owners presented evidence that there were markets for investors in some crude oil pipelines in the Lower 48 based on tariff income alone, those pipelines are distinguishable from the Trans-Alaska Pipeline System. It observed that the Owners had not presented evidence that there was a market for ownership interest in the pipeline based on tariff income.

The superior court also determined that the Trans-Alaska Pipeline System was a special-purpose property, or a property with "unique designs, special construction materials, or layouts that restrict their functional utility to the use for which they were originally built."[33] Jaffe's affidavit notes that "all of the carriers entered into the construction of the pipeline primarily for the purpose of ensuring a means of transporting their own oil." The superior court found that the Owners gave priority to the capacity demands of their affiliated producers and "are almost completely dependent upon their affiliate and parent companies." Thus valuing the pipeline using its tariff income, according to the superior court, would ignore the Owners' interests in transporting their

---

[33]     *Id.* at 28.

corporate affiliates' oil to market and monetizing the oil reserves of the Alaska North Slope.[34]

In light of these unchallenged factual findings, we cannot conclude that it was error to assess the Trans-Alaska Pipeline System under a use value standard.

**B.      The Use Value Assessment Standard Does Not Improperly Tax Non-Trans-Alaska Pipeline System Property.**

The Owners argue that even if the "full and true value" assessment standard does not compel the calculation of the pipeline's market value, the use value assessment standard is inappropriate in this case because it results in the improper taxation of items that are not taxable under AS 43.56. Alaska Statute 43.56.210(5), which defines taxable oil and gas property, does not include actual reserves of oil and gas, which are taxed separately.[35] The Owners' argument implies that because the superior court assessed the pipeline's value as a vessel for transporting oil reserves to market, the superior court improperly imposed a tax on the actual value of those oil reserves.

But the Owners have not shown that the superior court considered the value of Alaska North Slope oil reserves for any other reason than to support the conclusion that the Trans-Alaska Pipeline System has a unique use value distinct from its tariff income. The superior court calculated the replacement cost of the pipeline — before adjusting for depreciation — at $18.7 billion. It also found that the Owners and their

---

[34]      *See, e.g.*, *Tenneco, Inc.-Tenn. Gas Pipeline Div. v. Town of Cazenovia*, 479 N.Y.S.2d 587, 589 (N.Y. App. Div. 1984) (affirming use of the "replacement cost new" method rather than capitalized income method to value pipeline because the pipeline property was "unique and specially built . . . there is no market for the type of property and there are no sales of property for such use . . . and it is an appropriate improvement, which if destroyed, would be reasonably expected to be replaced or reproduced").

[35]      AS 43.55.017(a) provides that "neither the state nor a municipality may impose a tax on (1) producing oil or gas leases; (2) oil or gas produced or extracted in the state."

affiliates would reconstruct the Trans-Alaska Pipeline System not for its tariff income but in order to monetize the Alaska North Slope's $350 billion worth of oil reserves. But the superior court did not include the $350 billion figure as part of its replacement cost calculation. Instead, the superior court used the presence of those reserves to explain its determination that tariff income could not adequately capture the pipeline's value as a special-purpose property.

The Owners further argue that when it assessed the value of the pipeline, the superior court improperly included the value that the Owners' affiliate shippers receive by paying below-market regulated tariff rates to transport oil through the pipeline. The Owners argue that this "shippers' interest" is not "real and tangible personal property" taxable under AS 43.56.210(5)(A).[36]

The Department of Revenue defines shippers' interest as "the economic interest transferred to the shipper through the regulatory process which allows them to ship oil at tariff rates below those of an open and competitive market." The State's witness noted that a producer would "receive a benefit through shipping because of the lower-than-market rate." The witness acknowledged under cross-examination that this interest could only be "monetized" by a shipper actually using the pipeline to transport oil.

But in rejecting the tariff income approach, the superior court did not attempt to measure the value of shippers' interest or add any such measure to the value of the pipeline, nor did it even mention the shippers' interest concept. It merely

---

[36]     AS 43.56.210(5)(A) provides that "taxable property" under AS 43.56 "means real and tangible personal property used . . . within this state primarily in the exploration for, production of, or pipeline transportation of gas or unrefined oil . . . or in the operation or maintenance of facilities used in the exploration for, production of, or pipeline transportation of gas or unrefined oil."

concluded that tariff income cannot fully capture the value that the pipeline contributes to the integrated system of which it is a part. The Owners have not shown that the superior court valued non-pipeline property. They have merely demonstrated that it took the pipeline's role in transporting Alaska North Slope oil reserves into account in concluding that the pipeline's full and true value is not captured by the tariff income approach.[37] We therefore find no basis to conclude that the superior court erroneously considered the value of non-taxable property in its assessment.

C.   **The Superior Court Did Not Err In Deducting For Physical, Functional, And Economic Obsolescence.**

Notwithstanding their objection to the superior court's assessment of the Trans-Alaska Pipeline System's use value instead of its fair market value, the Owners concede that calculation of the replacement cost of the pipeline is a permissible method of measuring the "full and true value" of the pipeline because "replacement cost less depreciation" is one of several standard appraisal methods used to determine market value.[38] This valuation method involves determining the cost of constructing a

---

[37]      The Owners also briefly state that the superior court's attempt to reach the value of non-pipeline property violated the Due Process and Commerce Clauses because non-Trans-Alaska Pipeline System property is "owned by other entities and . . . taxable by other jurisdictions," and therefore cannot be taxed without apportionment. The Owners' briefing on this point is confined to a single sentence, and is not sufficiently developed to allow us to evaluate it. In any case, as discussed above, the Owners have not shown that the superior court assessed the value of non-pipeline property.

[38]      *See* 15 Alaska Administrative Code (AAC) 56.110(c) (2013) ("[T]he full and true value of pipeline property in operation is its economic value based upon the estimated life of proven reserves of the gas or oil then technically, economically and legally deliverable into the transportation facility. Economic value is determined by the use of standard appraisal methods such as replacement cost less depreciation, capitalization of estimated future net income, analysis of sales, or other acceptable methods.").

replacement property of equivalent utility to the Trans-Alaska Pipeline System, then deducting any necessary amounts for all three traditionally recognized forms of depreciation: physical, functional, and economic.[39] The superior court made depreciation adjustments for physical and other types of depreciation (using the economic age-life method), for functional obsolescence (based on the anticipated costs of the Owners' strategic reconfiguration plan), and for economic obsolescence (a scaling deduction for excess capacity). Both the Owners and the Municipalities contend that the superior court erred when making these deductions for obsolescence. The Owners claim that the superior court did not deduct enough; the Municipalities claim it deducted too much.

### 1. The superior court was not required to treat tariff regulations as a form of economic obsolescence.

" 'Economic obsolescence' is diminution in the value or usefulness of property' that 'results from external factors, such as decreased demand or changed governmental regulations.' "[40] The Owners argue that the superior court erred by not making a deduction for economic obsolescence based on the effect of government regulation of the tariffs the Owners are allowed to charge shippers for transportation of oil. This argument is based on the theory that the Trans-Alaska Pipeline System is worth less than a new pipeline because, under existing regulations, a new pipeline would be allowed to charge higher tariffs for transporting oil. They argue that by not making an obsolescence deduction for tariff regulation from the replacement cost of the pipeline, the superior court assessed the value not of the Trans-Alaska Pipeline System, but of a

---

[39]    AM. SOC'Y OF APPRAISERS, VALUING MACHINERY AND EQUIPMENT 66 (2d ed. 2005).

[40]    *Horan v. Kenai Peninsula Borough Bd. of Equalization*, 247 P.3d 990, 996 n.39 (Alaska 2011) (quoting BLACK'S LAW DICTIONARY 1107 (8th ed. 2004)).

"hypothetical pipeline" that is "free from the actual legal restrictions affecting the value of [the Trans-Alaska Pipeline System]."

### a. The State's appraisal did not treat tariff regulation as a form of depreciation.

At trial, the State's appraiser, Randy Hoffbeck, explained his decision not to make a deduction for economic obsolescence based on tariff regulation. He testified that there are three primary ways appraisers measure economic obsolescence: capitalized rent or income loss (comparing a property's income to that of another property without the perceived deficiency), paired sales analysis (comparing a property's sales price to that of another property without the perceived deficiency), and market extraction (taking the sale of a property and breaking its sales price down into physical, functional, and economic obsolescence). Hoffbeck testified that he was unable to perform any of those tests because they all require market data that does not exist for the Trans-Alaska Pipeline System due to "the lack of comparable income streams or comparable sales." The Owners' appraiser agreed that, assuming that a market for the Trans-Alaska Pipeline System does not exist, a capitalized income loss approach "would not apply."

Because Hoffbeck found those three tests to be inapplicable, he came up with his own method to determine whether tariff regulation had a significant impact on the pipeline's use value. Hoffbeck's test asked two questions: first, whether tariff regulation is "a hindrance to production or [whether it would] make the oil uncompetitive," and second, whether tariff regulation would prevent the Trans-Alaska Pipeline System from being constructed today if the pipeline did not exist.

Hoffbeck concluded that for a newly constructed replacement pipeline with a higher rate base,[41] the higher allowable tariffs would nonetheless not be so high that

---

[41]    A rate base is defined as "[t]he investment amount or property value on
(continued...)

producers could not "get the product to market profitably." Similarly, Hoffbeck determined that higher tariffs on a replacement pipeline would not make the Trans-Alaska Pipeline System less competitive compared to the existing Cook Inlet Pipeline. Finally, Hoffbeck looked at a New York case that held that if a property is worth the cost of replacement then, under the cost approach, a deduction for economic obsolescence based on earning capacity after reproduction is not appropriate.[42] Hoffbeck determined that the Trans-Alaska Pipeline System is worth the cost of replacement because the potential revenue to be gained compared to the cost of construction is comparable to the equivalent figures when the pipeline was first constructed in 1977. He testified that "the usefulness of [the pipeline] right now is similar to the usefulness of [the pipeline] . . . at the time it was constructed." Based on those tests, Hoffbeck "concluded that there was no external obsolescence to be calculated for [the pipeline]."

b.     The Owners argue that tariff regulation is a form of depreciation.

On appeal, the Owners do not dispute or even discuss Hoffbeck's treatment of economic obsolescence, nor do they specify the nature or amount of their argued-for economic obsolescence adjustment. Instead, they generally argue that the superior court's replacement cost measure should be adjusted downward because the hypothetical new property would have a greater allowable tariff than the Trans-Alaska Pipeline System and thus would generate more tariff income for the Owners.

---

[41](...continued)
which a company, esp[ecially] a public utility, is allowed to earn a particular rate of return." BLACK'S LAW DICTIONARY 1375 (9th ed. 2009).

[42]     *Tenneco, Inc.-Tenn. Gas Pipeline Div. v. Town of Cazenovia*, 479 N.Y.S.2d 587, 590 (N.Y. App. Div. 1984).

At trial, the Owners' appraiser used an "income shortfall" approach to support the conclusion that tariff regulations reduce the value of the Trans-Alaska Pipeline System. The appraiser compared the tariff income actually allowed to the tariff income from a hypothetical, newly constructed pipeline. The Owners' appraiser testified that because the rate base for a newly constructed property would be higher, the new property would be allowed to charge higher tariffs. The Owners' appraisal expert characterized this difference as economic obsolescence due to "income shortfall" and valued it at $1.3 billion. On appeal, the Owners again argue that "replacing the entire pipeline system would produce a tariff far different from the current [Trans-Alaska Pipeline System] tariff."

### c. The superior court did not err by refusing to make a deduction for tariff regulation.

The superior court found that the State gave "due consideration" to whether a deduction for tariff regulation should be made, and that the Owners "failed to establish that the [Department of Revenue and the State Assessment Review Board] erred in refusing to apply [their suggested] income shortfall method to determine economic obsolescence." We find no error in the superior court's conclusion.

The superior court heard testimony that the "income shortfall" method differs from the established method of calculating capitalized income loss because, instead of comparing similar properties — one regulated and one unregulated — in an established market, it compares the existing property to a hypothetical new one, both subject to current regulations. But the superior court heard ample testimony that this method of calculating depreciation is not a widely accepted appraisal practice, nor does it appear in any widely accepted appraisal manuals. The superior court concluded that the two appraisal manuals that the Owners cited as supporting the income shortfall technique were not authoritative, one because it was unpublished and not peer-reviewed

-22-                                                                 6867

and the other because a newer edition of the same text omitted any mention of the income shortfall technique. One witness also testified that the Owners' estimate of the tariffs that a hypothetical new pipeline would be allowed to charge was not reliable.

Even if the income shortfall method were an accepted appraisal technique in some cases, it would be improper here. The bedrock assumption of that technique is that the Trans-Alaska Pipeline System is less valuable than a hypothetical new pipeline because the new pipeline would be allowed to charge higher tariffs. But in this case, the primary value of the pipeline is its ability to monetize Alaska North Slope oil reserves because the companies collecting tariffs are closely affiliated with the companies paying tariffs. So the fact that a new pipeline could charge higher tariffs does not imply that the new pipeline would be more valuable to its Owners.

The highly integrated nature of the Trans-Alaska Pipeline System means that the companies paying to transport oil through the pipeline are closely affiliated with the companies collecting those tariffs. Several witnesses testified that, due to this integration, the value of the pipeline is completely divorced from the Owners' ability to charge tariffs. One witness testified that the tariff the Owners are allowed to charge has no effect on value because the same entity is levying and paying the tariff: "[W]hatever . . . the tariff might be, it is either benefiting the pipeline Owner . . . or it's benefiting the shipper, or some combination of that. And so . . . it doesn't make any difference what [the tariff] is." Relying on this evidence, the superior court found that tariff regulation is not a source of external obsolescence because such regulation is irrelevant to the value of the pipeline:

> [The pipeline's] highest and best use is not as a stand-alone investment property, but as an essential component of the integrated production and transportation system from the Alaska North Slope. The evidence has persuasively demonstrated that [the pipeline's] value lies in that use — a

use which is distinct from whatever tariff revenue [the pipeline] may generate. As such, there is no additional economic obsolescence caused by the fact that the [Trans-Alaska Pipeline System] is a regulated pipeline.

We conclude that the superior court did not err by refusing to treat tariff regulations as a form of economic obsolescence.

> **2.** **The superior court did not improperly consider unproven reserves of oil when calculating the economic life of the pipeline.**

One measure of depreciation, called economic age-life, is the age of the property in comparison to its economic life.[43] Alaska law requires that the measure of a pipeline's economic life be based on the estimated life of "proven" reserves of oil and gas.[44] Proven reserves are those reserves "then technically, economically, and legally deliverable" into the pipeline.[45] The superior court found that the record "amply" demonstrated that adequate proven reserves existed to allow the Trans-Alaska Pipeline System to operate until 2047. The Owners argue that in determining the reserves available for delivery into the pipeline, the superior court took into account reserves that do not constitute "proven reserves" as specified by statute.

When deciding which reserves were "then technically, economically, and legally deliverable" into the pipeline, the superior court found that it was not necessary for production facilities delivering the resources to the pipeline to currently exist for reserves to be "proven" as long as the technology to deliver those reserves existed. The superior court considered oil fields categorized by the State as "under development" and

---

[43] Depreciation is calculated from estimated economic life by "calculating the ratio of the effective age of the property to its economic life expectancy and applying this ratio to the property's total cost." APPRAISAL INST., *supra* note 16, at 420.

[44] AS 43.56.060(e)(2).

[45] *Id.*

"under evaluation" to be "proven reserves." A State's witness explained that oil "under development" means oil where facilities to transport the oil to the Trans-Alaska Pipeline System were in the process of being developed, and oil "under evaluation" means oil that has been discovered and determined to be technically recoverable.

The Owners argue that oil reserves under development and under evaluation are not "proven reserves." They contend that the statutory term "proven reserves" is a technical term[46] that requires the oil in question to be "recoverable based on existing conditions." For support, the Owners cite a House Finance Committee report on the bill that eventually became AS 43.56.[47] In the report, the Director of the Oil and Gas Division told the legislature that "reserves means the amount recoverable at today's technology and today's prices."[48]

It is unclear from the Owners' briefing why this statement supports their reading of the statute. The statement appears consistent with the superior court's definition of "proven reserves" as those reserves theoretically recoverable with today's technology even if the facilities to recover the oil are not actually in place. Moreover, the complete legislative history indicates confusion as to the meaning of the phrase "proven reserves." A member on the Finance Committee remarked that "no matter what

---

[46] Under Alaska law, statutory words and phrases that are "technical" and "those that have acquired a peculiar and appropriate meaning, whether by legislative definition or otherwise, shall be construed according to the peculiar and appropriate meaning." AS 01.10.040(a).

[47] Minutes, H. Fin. Comm. Hearing on H.B. 1, 8th Leg., 1st Spec. Sess. (Oct. 22, 1973).

[48] *Id.* at 52 (comments of Homer Burrell, Director, Division of Oil and Gas).

is done in this area, proven reserves will become a matter of litigation."[49] Another indicated that "the State's information" concerning proven reserves would be "as good as any company's in the industry."[50] The committee did not discuss the meaning of the phrase in more detail.[51]

The Owners also cite an industry definition of "proven reserves." The Society of Petroleum Engineers defines the term as "[t]he quantities of crude oil, natural gas and natural gas liquids which geological and engineering data demonstrate with reasonable certainty to be recoverable in the future from known oil and gas reservoirs under existing economic and operating conditions." The definition goes on to include several types of proven reserves, including "[p]roved developed reserves behind the casing of existing wells or at minor depths below the present bottom of such wells which are expected to be produced through these wells in the predictable future," as well as "[p]roved [u]ndeveloped [r]eserves" which are "[p]roved reserves to be recovered from new wells on undrilled acreage or from existing wells requiring a relatively major expenditure for recompletion or new facilities for fluid injection." The superior court concluded from this definition that "proven reserves" include undeveloped reserves without the current infrastructure for delivery. We agree. The Owners have not shown

---

[49] Minutes, H. Fin. Comm. Hearing on H.B. 1, 8th Leg., 1st Spec. Sess. 64 (Oct. 23, 1973) (comments of Representative Keith Specking).

[50] *Id.* (comments of J.H. Hogan, staff member of the House Finance Committee).

[51] A now-repealed Alaska statute, codified in 1975, dealing with property tax on oil and gas reserves also supports the superior court's interpretation of the term. That statute defined "proven reserves" as "the volumes of oil and gas in a known deposit which geological and engineering information indicate will be recoverable in the future under prevailing economic conditions and technology." Former AS 43.58.190(8) (1975).

that the superior court's definition of "proven reserves" is inconsistent with the statute or any widely accepted industry definition of the term.

### 3. The superior court did not err in reducing the assessed value of the pipeline to account for excess capacity.

At trial, the superior court heard evidence that the Trans-Alaska Pipeline System's actual throughput is lower than its maximum capacity. The Owners urged the superior court to make a downward scaling adjustment to the assessed value of the pipeline to account for this excess capacity as economic or functional obsolescence. Such an adjustment is appropriate to account for features that would be expensive to replace but that add little or no value to the property. The superior court provided the example of a feature that costs more than the value it adds to the property, such as a building with ceilings that are too high. In this case, while it would be expensive to build a new pipeline with the Trans-Alaska Pipeline System's current carrying capacity, such "superadequacy" adds little value over a smaller, less expensive pipeline. The superior court found that the Trans-Alaska Pipeline System's excess capacity was a form of economic, not functional, obsolescence.[52]

---

[52] The dissent argues that "at no point during the underlying litigation . . . did anyone argue for an economic obsolescence deduction based on excess capacity" and that "[t]he Owners argued to the superior court that excess capacity warranted a deduction for *functional obsolescence*, not *economic obsolescence*." Dissent at 40.

But the issue of economic obsolescence was squarely before the superior court in this case. The Owners sought deductions of all varieties, arguing in their points on appeal in the superior court that the Assessment Review Board "Failed to Apply All Forms of Obsolescence in its Cost Approach Considerations" and that "[i]t is a fundamentally wrong application of valuation principles not to apply all three forms of depreciation (physical, functional, and economic)." The Owners specifically argued that the Assessment Review Board "Failed to Properly Consider Economic Obsolescence with Regard to the [Trans-Alaska Pipeline System]." Contrary to the dissent's assertion,

(continued...)

In explaining its choice not to deduct for functional obsolescence, the superior court found that the Trans-Alaska Pipeline System is legally required to maintain a physical capacity of 1.1 million barrels per day by the terms of the Amended Capacity Settlement Agreement[53] and by AS 42.06.290(a).[54] The superior court also found that "maintaining [the pipeline's] ability to operate in a broad range of throughputs

_____

[52](...continued)

nothing in the points on appeal indicates that the Owners limited their argument for an economic obsolescence deduction to considerations of tariff regulations. The Owners argued broadly for deductions of every type. And they argued broadly for economic obsolescence deductions, stating simply, "Valuation standards require consideration of economic obsolescence."

When the Owners argued in their points on appeal to the superior court that there should be a deduction for "declining. . . production" in "the North Slope Oil Fields" leading to less "crude oil being shipped through [the Trans-Alaska Pipeline System] every year," the Owners argued broadly that the Assessment Review Board "either entirely disregarded" that factor "and/or failed to give adequate consideration" to that factor "in determining the assessed value." Similarly, the Owners argued in their points on appeal to the superior court that the Assessment Review Board "fail[ed] to properly calculate obsolescence" when it ignored the "excess capacity" resulting from "deplet[ing]" oil fields. In neither excess-capacity argument did the Owners restrict themselves to seeking a deduction for functional obsolescence; rather, the Owners argued as broadly as possible that the Assessment Review Board erred more generally by refusing to take account of this excess capacity as any form of obsolescence.

Thus, we cannot agree with the dissent that the superior court made an economic obsolescence deduction based on excess capacity "without any prior notice to the parties." Dissent at 40.

[53]     The Amended Capacity Settlement Agreement "assure[s] the State of a certain level of excess capacity to optimize the development of its natural resources."

[54]     AS 42.06.290(a) provides that "[a] pipeline carrier may not abandon or permanently discontinue use of all or any portion of a pipeline . . . without the permission and approval of the commission [after] a finding by the commission that continued service is not required by public convenience and necessity."

enhances the value of the pipeline," because the pipeline "is the only viable means of transportation for an entire oil region that includes vast proven reserves." The superior court found that the value of maintaining a flexible carrying capacity was demonstrated in part by the Owners' $600 million strategic reconfiguration project to ensure that the Trans-Alaska Pipeline System has the ability "to efficiently operate at throughputs between 200,000 [barrels per day] and 1.14 million [barrels per day]." For these reasons, the superior court found a functional obsolescence deduction to be improper.

Notwithstanding these findings and conclusions, the superior court went on to make a deduction for economic obsolescence based on the superadequacy of the pipeline. The superior court found that production in "most North Slope fields" is declining significantly, and that the pipeline's average 2006 throughput was significantly lower than capacity. It also found that "[i]f a plant is not operating at capacity for economic reasons, the inutility is caused by economic obsolescence."[55] Therefore, the superior court found that "[w]hile [the Trans-Alaska Pipeline System] is required to have a design capacity of at least 1.1 million [barrels per day], the fact that capacity is not all being used to transport affiliated oil reduces the utility and value of [the pipeline] as of the lien date."

The Owners appeal these decisions, and the Municipalities cross-appeal on a number of grounds.

> **a.    There was sufficient evidence to support the superior court's decision that excess capacity is a form of obsolescence.**

In their cross-appeals, the Municipalities argue that the fact that the Trans-Alaska Pipeline System operates below capacity does not justify a deduction for

---

[55]    The superior court was quoting AM. SOC'Y OF APPRAISERS, *supra* note 39, at 98.

economic obsolescence from the assessed value of the pipeline. Specifically, the Municipalities argue that the superior court's finding that the Owners are legally obligated to maintain a capacity of 1.1 million barrels per day, and its subsequent refusal to deduct for functional obsolescence, is incompatible with its decision to use a scaling deduction for economic obsolescence. The Owners and the State maintain that the deduction was appropriate. For their part, the Owners appeal the superior court's finding that the pipeline's excess capacity is legally compelled, arguing that the parties to the Amended Capacity Settlement Agreement did not intend for it to have the effect of requiring them to maintain a physical capacity of 1.1 million barrels per day.

Whether the Trans-Alaska Pipeline System's excess capacity reduces its value is a question of fact, and we will not disturb the findings of the superior court unless we are left with a "firm and definite conviction" that a mistake has been made.[56] We conclude that there was sufficient evidence to support the superior court's ruling that a deduction for economic obsolescence was appropriate based on the superadequacy of the pipeline.

Both the State and the Owners agree that the Trans-Alaska Pipeline System operates below its projected maximum throughput capacity and that the resulting "superadequacy" is a type of functional obsolescence. At trial the State's appraiser discussed scaling, which he originally performed as part of the functional obsolescence deduction. He concluded that "[a]t this point in time, there's no real thought that they would ever recover back up to their design capacity, so we need to be able to adjust for that, because somebody that's going to acquire the property isn't going to spend money on capacity that it doesn't need or isn't required to have." The superior court accepted

---

[56]     *City of Nome v. Catholic Bishop of N. Alaska*, 707 P.2d 870, 876 (Alaska 1985) (quoting *Stanton v. Fuchs*, 660 P.2d 1197, 1198 (Alaska 1983)).

the substance of this view and found that "[w]hile [the Trans-Alaska Pipeline System] is required to have a design capacity of at least 1.1 million [barrels per day], the fact that capacity is not all being used to transport affiliated oil reduces the utility and value of [the pipeline] as of the lien date." We conclude that there is no error in the superior court's decision to give credence to the appraiser's assessment, even if it did so under the label of economic instead of functional obsolescence.

Both the Owners and the Municipalities urge us to reach the merits of whether the Owners are legally obligated, by statute or by contract, to maintain a capacity above average throughput. We decline to do so because whether a deduction for economic obsolescence is appropriate does not depend on any obligation the Owners may have to maintain a certain capacity.

Any obligation the Owners may have to maintain excess capacity does not make an economic obsolescence deduction for superadequacy improper. If there were no requirement to maintain excess capacity then, according to the State's own appraiser, a deduction for superadequacy would be appropriate because the too-large pipeline is no more valuable than a smaller, less expensive pipeline. The addition of a legal requirement to maintain a certain operating capacity does not change that analysis. Such an obligation cannot make the pipeline worth more; if anything, this constraint would make the pipeline less valuable than before. A deduction for superadequacy, therefore, is still appropriate. We conclude that it was not clear error for the superior court to find that excess capacity was a type of obsolescence even if the Owners had an obligation to maintain a certain capacity.

We recognize that the superior court's finding on this point — that a deduction for functional but not economic obsolescence was improper because of the Owners' legal obligations to maintain a certain capacity — may reflect a certain degree of internal inconsistency. But it may also be that the superior court's discussion of the

Owners' legal obligations was merely an attempt to explain why excess capacity is a form of economic, not functional, obsolescence. And whether the superior court's deduction was labeled as functional or economic obsolescence is of no consequence. After reviewing the superior court's ultimate decision to deduct for excess capacity, we conclude that it was well supported by the evidence and legally sound.

### b. The matter was fully litigated below.

The Boroughs[57] argue that it was error to make an economic obsolescence adjustment for excess capacity because the parties did not directly litigate the issue below. The Boroughs argue that the superior court's decision was improper and based on "little to no guidance," first because the superior court did not apply the appropriate standard of review to the Assessment Review Board's decision finding no such depreciation, and second because the Owners had the burden to show economic obsolescence and they did not make such a showing.

The Boroughs' first assertion is contrary to statute. The Boroughs argue that "the trial court was required to find that the Board's decision finding no additional economic obsolescence was unequal, excessive, or improper under AS 43.56.130(f)." But that provision controls the Assessment Review Board's hearings on appeal from the Department of Revenue, not the superior court's de novo review of the Assessment

---

[57] The City of Valdez does not join in this argument, stating that it "does not object to the superior court, in a de novo review with new evidence, making its own conclusions on appraisal theory so long as appropriate deference is afforded the Board's expertise."

Review Board's findings.[58] The same statute provides that the superior court on appeal conducts a trial de novo of the Assessment Review Board's decision.[59]

The Boroughs' second claim also fails. The arguments for and against applying a scaling deduction for excess capacity were raised and fully litigated at trial. In their statement of points on appeal to the superior court, the Owners expressly argued that the Assessment Review Board had erred by failing to adequately account for the fact that production was declining as oil fields were depleted:

> The super adequacy of the property increases as the throughput of unrefined oil continues to decline over time (as the oil fields feeding the line continue to deplete) and the capacity of the TAPS is significantly underutilized. This excess capacity has associated significant costs of operation which can not be ameliorated or reduced and thereby significantly and negatively impact the property. The [Assessment Review Board]'s failure to properly calculate obsolescence constitutes the application of a fundamentally wrong principle of appraisal and acts to create an excessive valuation.

And according to treatises submitted into evidence, the scaling procedure is similar for both types of obsolescence calculation. Therefore, the superior court's decision to label excess capacity as economic rather than functional obsolescence is not reversible error.

### c. The superior court did not count economic obsolescence from excess capacity twice.

Finally, the Boroughs argue that the superior court counted depreciation due to excess capacity twice by using both the economic age-life method and applying an additional scaling deduction for excess capacity. They cite various parties' witnesses and treatises acknowledging that the economic age-life method is a measure of total

---

[58]    AS 43.56.130(a) (referencing AS 43.56.120(a)).

[59]    AS 43.56.130(i).

depreciation. Therefore, they argue, a second adjustment for the excess capacity of the pipeline double-counts economic obsolescence.

The superior court characterized its economic life calculation as a measure of how far into the future the Trans-Alaska Pipeline System could continue operating at a rate of at least 200,000 barrels per day, its minimum capacity. The superior court acknowledged that the related economic age-life measure captures more than just physical depreciation. But at trial, the State's appraiser testified — and the superior court recognized — that while economic age-life captures more than just physical depreciation, it also allows for a "separate look" at other types of obsolescence. *The Appraisal of Real Estate* similarly indicates that other deductions for obsolescence may be appropriate when using the economic age-life method.[60] It was therefore not error for the superior court to examine other types of obsolescence that may not have been accounted for in the economic age-life calculation.

The question, then, is whether the superior court's calculation of economic life accounted for obsolescence caused by declining throughput such that an independent deduction for excess capacity would be double counting. The Owners argue that the end-of-life estimate does not account for such obsolescence because, while it takes into account the projected level of reserves to be transported through the Trans-Alaska Pipeline System, it does not take into account the fact that the pipeline has a greater physical capacity than that projected level of reserves would demand.

Both the Department of Revenue and the superior court took into account projections for declining throughput in determining economic life. The external production forces that mean less oil is being delivered to the pipeline were factored into the economic age-life equation. But the economic age-life calculation did not take into

---

[60] APPRAISAL INST., *supra* note 16, at 421-22.

account the fact that the design capacity of the pipeline — and therefore the cost of a hypothetical replacement — is considerably greater than necessary to handle projected throughput. As noted in *Valuing Machinery and Equipment*, when operating level is significantly less than design capacity, "the asset is less valuable than it would otherwise be," and that drop in value comes not just from the decline in operating level, but also from the superadequacy that exists.[61] We therefore find that the superior court's deduction for economic obsolescence due to excess capacity was not improper.

**D.  Interest On The Owners' Supplemental Taxes Runs From The Original 2006 Due Date.**

After assessing the value of the Trans-Alaska Pipeline System, the superior court directed the Department of Revenue to issue a supplemental certified assessment roll "reflecting the 2006 value of [the pipeline] within 30 days" of the issue of final judgment. That supplemental roll was to be the basis for the Municipalities to assess tax bills and for the State to assess tax credits. The superior court ruled that interest due on the additional taxes owed would run from "the due date in the year of the original assessment rather than from the date of reassessment."[62] The superior court found that date to be June 30, 2006.[63] The interest rate was set at the statutory rate of eight percent per year.[64]

The Owners appeal, arguing that the superior court's decision improperly imposed interest on taxes before they were assessed and payment was due. According

---

[61]  AM. SOC'Y OF APPRAISERS, *supra* note 39, at 97.

[62]  The superior court was quoting *Cool Homes, Inc. v. Fairbanks North Star Borough*, 860 P.2d 1248, 1258 (Alaska 1993) (internal quotation marks omitted).

[63]  15 AAC 56.065 provides that taxes levied under AS 43.56 are due by June 30.

[64]  AS 43.56.160.

to the Owners, interest runs only on unpaid or delinquent taxes; because they paid all the taxes they owed in 2006 and no obligation was owing until the supplemental assessment was issued in 2010, the Owners argue that taxes could not be delinquent until the assessment date in 2010.

We addressed a similar issue in *Cool Homes, Inc. v. Fairbanks North Star Borough*, where we held that "interest on a tax assessment runs from the due date in the year of the original assessment rather than from the date of reassessment."[65] In that case, the property lessor did not pay its property taxes for three years.[66] The lessor sought review of the assessment, and the superior court upheld the Borough's right to levy the tax in question but remanded for recalculation of the assessment amount.[67] The lessor argued that interest and penalties "could not begin to accrue" until a valid assessment was made after remand.[68] We held that determining the interest and penalties due were separate questions with separate standards.[69] While penalties are considered punitive, "[t]he assessment of interest for late payment has no punitive element."[70] Rather, interest

___

[65] 860 P.2d at 1258.

[66] *Id.* at 1253.

[67] *Id.*

[68] *Id.* at 1255.

[69] *Id.* at 1258.

[70] *Id.* at 1257 n.12 (quoting *N. Slope Borough v. Sohio Petroleum Corp.*, 585 P.2d 534, 546 (Alaska 1978), *superseded by statute*, Ch. 23, §§ 2-3, SLA 1991, *as recognized in State, Commercial Fisheries Entry Comm'n v. Carlson*, 270 P.3d 755 (Alaska 2012)). We recently held in *Carlson* that interest was punitive where the legislature raised the statutory interest rate from 8% to 11% compounded quarterly. 270 P.3d at 761 n.38. But the text quoted from *Sohio Petroleum* still applies in this context where the interest rate is 8% and the legislature has taken no steps to impose a punitive

(continued...)

"is intended to compensate the party to whom the sum is owed for the use of the money during the period of nonpayment [and does not] depend[] on which party is at fault for the delay."[71]

The Owners contend that *Cool Homes* is distinguishable because it dealt with past-due and not retrospectively assessed taxes. For support, they cite our holding in *Alascom v. North Slope Borough* that "[u]ntil the borough has exercised its right to demand real property taxes in the manner provided by statute there can be no valid tax and hence no delinquency within the meaning of AS 29.53.180, which authorizes penalties and interest on delinquent taxes."[72] In that case the municipality failed to list or assess the property for several years.[73]

But our opinion in *Cool Homes* expressly limited *Alascom*, stating that *Alascom*'s rationale "is not applicable where the municipality makes an assessment of the real property in question, but makes a mistake as to the amount of the assessment."[74] And we explicitly held that "*Alascom* does not stand for the proposition that interest on taxes imposed on property which is timely assessed should not relate back to the original due date."[75] Here, the superior court's judgment was not a new assessment but instead a reassessment of the original, mistaken assessed value of the pipeline. We agree with

---

[70](...continued)
element.

[71]     *Cool Homes*, 860 P.2d at 1257.

[72]     *Alascom, Inc. v. N. Slope Borough, Bd. of Equalization*, 659 P.2d 1175, 1180 (Alaska 1983).

[73]     *Id.* at 1177.

[74]     860 P.2d at 1257.

[75]     *Id.* at 1258.

the superior court that interest on the additional taxes owed runs from the due date in the year of the original assessment.[76]

## V.    CONCLUSION

We find no error in the superior court's standard or method of valuation of the Trans-Alaska Pipeline System, nor in the specific deductions it made to account for depreciation. And we conclude that the superior court did not err by finding that interest on the supplemental taxes owed runs from June 30, 2006. We therefore AFFIRM the superior court's decision.

---

[76]    While we recognize that interest is meant to compensate for lost use of money without regard to fault, we also understand that the 8% annual return may not reflect the reality of today's interest rates and that the Municipalities would have struggled to make anything close to an 8% annual return on this money had they received it in 2006. For evidence of this we need look no further than the related Rule 67 appeal in this matter, in which neither party wished to hold the disputed money while this appeal was pending for fear of being liable for compensatory interest if they did not prevail. But the 8% interest rate is mandated by statute, and any reform should be sought from the legislature, not the courts.

WINFREE, Justice, with whom STOWERS, Justice, joins, dissenting in part.

## I.   OVERVIEW

Today the court implicitly decides a long-standing dispute between the State of Alaska, Department of Natural Resources, and the companies controlling North Slope oil production and distribution through their related companies' Trans-Alaska Pipeline System (TAPS) and oil tankers. This dispute is: Why has North Slope oil production and TAPS input declined so that TAPS has excess capacity? Is it because the oil companies are warehousing proven reserves for their own internal business reasons, notwithstanding that the reserves are technically and economically available for production,[1] or is it because external factors limit current production of proven reserves? The dispute arose in a matter before this court in 2012, when we considered certain superior court rulings in a legal battle over development of Point Thomson oil and gas reserves, but that battle was settled.[2]

The dispute again arises, this time indirectly from a legal battle over the 2006 TAPS property tax valuation and the concept of depreciation for obsolescence, a battle in which the Department of Revenue, and not the Department of Natural Resources, is a participant. In the superior court proceedings, the parties contested whether there should be a depreciation deduction for functional obsolescence due to TAPS's excess capacity — a functional obsolescence deduction is appropriate when an asset has become less useful due to its flawed or outdated physical characteristics. The

---

[1]     The superior court found that there are adequate proven reserves to allow TAPS to operate at least until 2047 and that North Slope reserves contain billions of barrels of "technically and economically recoverable oil." We affirm this finding, Op. 24-27, noting that the superior court estimated the reserves to be worth $350 billion, Op. 14.

[2]     *State, Dep't of Natural Res. v. ExxonMobil Corp.*, No. S-13730 (Alaska, filed May 10, 2011).

superior court rejected depreciation for functional obsolescence. However, after trial and without any prior notice to the parties, the superior court determined that TAPS's excess capacity warranted an economic obsolescence deduction — an economic obsolescence deduction is appropriate when an asset has become less useful due to external causal factors affecting the entire business.[3] But at no point during the underlying litigation, either before the State Assessment Review Board (SARB) or the superior court, did anyone argue for an economic obsolescence deduction based on excess capacity or present evidence demonstrating external causes of production decline and ensuing throughput decline.[4]

---

[3] The superior court stated that "the fact that external economic factors, and specifically the decreased availability of North Slope oil, may preclude the full use of TAPS' capacity, does form a basis for a scaling adjustment based on economic obsolescence."

[4] The court incorrectly states that the Owners urged the superior court to find that TAPS's excess capacity warranted a deduction for "economic or functional obsolescence." Op. 27. The Owners argued to the superior court that excess capacity warranted a deduction for *functional obsolescence*, not *economic obsolescence*. The Owners' argument for an economic obsolescence deduction was limited to the assertion that tariff regulations were a form of economic obsolescence, which both the superior court and this court correctly rejected. Op. 19-24.

The Owners do not even contend on appeal that they argued in the superior court for an economic obsolescence deduction for low throughput — in their brief to us they describe the Department of Revenue's original characterization of the obsolescence factor as functional, and then simply state that the superior court addressed the obsolescence factor "from a different perspective." At oral argument before us the Owners' attorney expressly described what happened as follows:

> Everybody analyzed it in the past as functional, the State, the SARB, taxpayer, were treating it as functional. But it was the same facts, it was the same condition of excess capacity, that was being addressed. And so all Judge Gleason did was

(continued...)

By affirming the superior court's determination that an economic obsolescence deduction is warranted for the 2006 TAPS valuation, the court necessarily holds that TAPS's throughput decline is caused by external factors outside the oil companies' control. That issue was not litigated in the superior court, neither the superior court nor the court today explains exactly what factors external to the oil

---

[4](...continued)
> change the way she named the adjustment she made for excess capacity of TAPS. Instead of calling it functional, she called it external. But she was analyzing those same facts and just calling it another name.

The Department of Revenue is even more direct in a heading in its brief: "The superior court properly determined that lower available throughput in TAPS is a basis for economic obsolescence despite that point not being specifically advocated at trial."

In response to my dissent the court asserts that because the Owners (1) stated in their notice of appeal to the superior court that SARB failed to apply all forms of depreciation, and (2) argued economic obsolescence to the superior court, the issue was squarely before the superior court. Op. 27 n.52. The broad sweep of the notice of appeal is irrelevant — what is relevant is the precise nature of the economic obsolescence argument the Owners actually presented to the superior court. The economic obsolescence argument presented to the superior court was based on tariff regulations, not low throughput. If the Owners presented evidence to support a claim of economic obsolescence based on low throughput, then the court should be able to identify and quote at least one trial expert witness who testified that low throughput should result in a depreciation deduction for economic obsolescence. The court did not, because it cannot. If the Owners presented and proved their entitlement to an economic obsolescence depreciation deduction based on low throughput, the court should be able to identify and quote from at least one trial expert witness who testified about factors external to the integrated enterprise that have caused the declining production and delivery of oil to TAPS. The court did not, because it cannot. Both the Department of Revenue and the Owners conceded that the question of an economic obsolescence depreciation deduction for low throughput was not specifically raised at trial — the court is in error on this point.

companies are causing TAPS's throughput decline, and the determination likely will have an impact far beyond TAPS's 2006 property tax valuation.  I would vacate the superior court's determination that an economic obsolescence deduction is warranted for the 2006 tax year and remand for further trial proceedings on the question; I therefore dissent on this aspect of the court's decision.

## II.    DISCUSSION

### A.    A Separate Functional Obsolescence Deduction Was Correctly Rejected By The Superior Court.

The superior court found that a separate functional obsolescence depreciation deduction[5] is improper because the Owners have obligations to maintain TAPS's physical capacity at 1.1 million barrels per day.  This capacity requirement makes a functional obsolescence deduction inappropriate because TAPS's excess capacity provides value by meeting minimum capacity requirements; TAPS's best and most cost-effective design would have to incorporate this required capacity — it therefore is not physically flawed or outdated.  I agree with the court that this aspect of the superior court's decision is correct.[6]

---

[5]    Functional obsolescence is defined as "a flaw in the structure, materials, or design that diminishes the function, utility, and value of the improvement." APPRAISAL INST., THE APPRAISAL OF REAL ESTATE 331 (13th ed. 2008).

[6]    In my view this same reasoning should preclude a depreciation deduction for economic obsolescence, as well.  The court concedes that there is "a certain degree of internal inconsistency" in the superior court's ruling, but brushes it aside without any explanation. Op. 31.  As part of the remand I would order for further trial proceedings, the superior court would be directed to explain this inconsistency.

**B.** **A Separate Economic Obsolescence Deduction May Be Appropriate But Was Not Adequately Litigated In The Superior Court.**

**1.** **Depreciation for economic obsolescence relies on a different threshold determination than for functional obsolescence.**

Because depreciation for functional obsolescence was correctly rejected, a separate obsolescence depreciation deduction could be warranted only under an economic obsolescence theory. Economic obsolescence is "the loss in value or usefulness of a property caused by factors external to the asset," including increased costs, reduced demand, increased competition, regulation, or similar factors.[7] "[E]conomic obsolescence is usually a function of outside influences that affect an entire business . . . ."[8] Therefore, a separate economic obsolescence deduction for TAPS would be appropriate only if loss in value were caused by external factors beyond the control of the integrated enterprise of which TAPS is a part.

It is here that the court's analysis falters — the court, like the superior court, relies on the declining oil supply to TAPS as an external factor supporting a depreciation deduction for economic obsolescence. But the court is affirming the superior court's determination that to properly value TAPS, it must be considered as an integrated part of the entire production-transportation business.[9] In short, the Owners' integrated

---

[7] AM. SOC'Y OF APPRAISERS, VALUING MACHINERY AND EQUIPMENT 96-97 (2d ed. 2005); *see also Horan v. Kenai Peninsula Borough Bd. of Equalization*, 247 P.3d 990, 996 n.39 (Alaska 2011) (quoting BLACK'S LAW DICTIONARY 1107 (8th ed. 2004)).

[8] AM. SOC'Y OF APPRAISERS, *supra* note 7, at 97.

[9] The superior court found that TAPS is part of an integrated economic enterprise in which the TAPS owners are closely affiliated with companies producing Alaska North Slope oil, and that "TAPS was built . . . because of the overwhelming economic value arising from its highly integrated use for transporting [Alaska North Slope] production from affiliated producers." As the court notes, these findings are

(continued...)

-43- 6867

enterprise controls TAPS's supply — therefore declining supply warrants an economic obsolescence depreciation deduction only if it is caused by factors external to the Owners' integrated enterprise. The court, like the superior court, identifies no relevant external factors causing declining oil supply to TAPS.

If low throughput is the result of factors external to the integrated enterprise, then it may be appropriate to apply an economic obsolescence deduction. But if low throughput is the result of factors within the integrated enterprise's control — for example, if affiliated production companies failed to utilize productive fields or delivered less oil to TAPS for the integrated enterprise's internal purposes — then an economic obsolescence deduction may be inappropriate or at least limited. As alluded to earlier, in *State, Department of Natural Resources v. ExxonMobil Corp.* the Department of Natural Resources argued that oil companies, in derogation of lease obligations, were deliberately stalling production of the Point Thomson oil and gas reserves to advance their own internal interests.[10] More recently, Alaskans have been inundated with political commentary regarding a referendum to overturn the legislature's latest restructuring of Alaska's oil-tax framework,[11] including spirited debate whether oil production has been limited by excessive taxation or oil companies have delayed production to leverage legislative action lowering oil taxes.

Let me be clear: I raise these issues simply to make my point about the necessary threshold determination for an economic obsolescence deduction. I have no

---

[9](...continued)
unchallenged.

[10]    Brief for Appellant at 2-3, *State, Dep't of Natural Res. v. ExxonMobil Corp.*, No. S-13730 (Alaska, filed May 10, 2011).

[11]    *See* Ch. 10, § 13, SLA 2013; Veto Referendum for Senate Bill (S.B.) 21 (2014).

view on the actual cause of TAPS's low throughput and would look to the development of a full evidentiary record, rather than public commentary or the State's briefing in the Point Thomson matter, as the factual basis for a reasoned decision. And I also note that delaying oil production to serve the integrated enterprise's internal business purposes would not necessarily be an inappropriate business decision; but such a decision might be incompatible with a depreciation deduction for economic obsolescence due to TAPS's declining throughput.

This threshold issue is unique to economic obsolescence and highlights the important distinction between economic and functional obsolescence, which the court clearly misunderstands. Even if both forms of obsolescence might be used to calculate a loss in TAPS's value due to excess capacity, they focus on different reasons for the excess capacity and therefore require different threshold determinations.[12] The court is incorrect in stating, contrary to indisputable appraisal theory,[13] that "whether the superior court's deduction was labeled as functional or economic obsolescence is of no consequence."[14] Because the Owners did not argue for low-throughput economic obsolescence, the threshold issue — whether factors external to the integrated enterprise caused the low throughput and resulting excess capacity — was not litigated at trial.

---

[12] *See* AM. SOC'Y OF APPRAISERS, *supra* note 7, at 98 ("If the plant is not operating at capacity for economic reasons, the inutility is caused by economic obsolescence. If there is an imbalance in the productive capacity (e.g., a production bottleneck), the inutility is caused by functional obsolescence.").

[13] *See supra* notes 5, 7, 8, 12, and accompanying text.

[14] Op. 32. This statement also is inconsistent with our affirmance of the superior court's determination that a functional obsolescence deduction was not warranted.

**2. As a matter of procedural fairness, the parties should be allowed to litigate whether a separate economic obsolescence deduction is appropriate.**

The North Slope Borough and the Fairbanks North Star Borough (the Boroughs) rightfully contend that the superior court erred by allowing the economic obsolescence deduction for low throughput when "[n]o one argued or presented evidence . . . that TAPS should be scaled as a result of a lack of supply."  The court nonetheless rejects this contention, reasoning that because the claim for "a scaling deduction for excess capacity" was litigated and because the scaling calculation is similar for both types of obsolescence, the parties adequately litigated the substance of a low-throughput-based economic obsolescence deduction.[15]

Although the scaling *calculation* may be used to measure either functional or economic obsolescence,[16] as discussed above the two forms of obsolescence stem from different sources and litigating one did not adequately prepare the superior court to rule on the other.  Although some arguments and testimony touched on the issue of oil field decline, low throughput was raised only tangentially to functional obsolescence arguments.[17]

---

[15]    Op. 33.

[16]    *See* AM. SOC'Y OF APPRAISERS, *supra* note 7, at 98 (explaining that cost-to-capacity calculation may be used to calculate impact of inutility from either functional or economic obsolescence sources).

[17]    For example, the Owners argued for an underutilization deduction due to declining oil fields but characterized this as functional obsolescence and focused on resulting increased operating costs.  This begged the question of the low throughput's cause.

We have held that we may affirm "on any basis supported by the record, even if that basis was not considered by the court below or advanced by any party."[18] But we also have held that "[b]ecause basic fairness requires an opportunity to present relevant evidence, applying an unanticipated body of law could be an abuse of discretion if doing so were to make different outcome-determinative facts relevant."[19] Here the Boroughs argue that to receive a separate economic obsolescence deduction, the Owners had (but failed to meet) the burden of raising the issue and proving the cause and quantity of economic obsolescence due to low throughput.[20] The Boroughs also argue that if the Owners had advanced a claim for economic obsolescence based on low throughput, the Boroughs would have had an opportunity to present evidence and arguments rebutting it. I agree — because the threshold factor for an economic obsolescence deduction was not directly litigated, a remand on this issue is necessary as a matter of procedural fairness.

---

[18] *Powercorp Alaska, LLC v. Alaska Energy Auth.*, 290 P.3d 1173, 1183 n.25 (Alaska 2012) (quoting *Smith v. Stafford*, 189 P.3d 1065, 1070 (Alaska 2008)).

[19] *Frost v. Spencer*, 218 P.3d 678, 682 (Alaska 2009); *see also Powercorp*, 290 P.3d. at 1193 (Winfree, J., dissenting) (disagreeing with ruling on issue not litigated before the superior court because parties had not submitted evidence on issue); *Crowley v. State, Dep't of Health & Soc. Servs.*, 253 P.3d 1226, 1232 n.31 (Alaska 2011) (declining to consider arguments not raised before trial court if issue is dependent on new or controverted facts).

[20] *See* AS 43.56.130(e); *N. Star Alaska Hous. Corp. v. Fairbanks N. Star Borough Bd. of Equalization*, 844 P.2d 1109, 1110-12 (Alaska 1993).

C.     **There May Have Been Double Counting Of Economic Obsolescence, But It Also Was Not Adequately Litigated Below.**

Economic age-life is a method of measuring depreciation based on the ratio of a property's effective age to its economic life expectancy.[21]  The superior court concluded that TAPS's physical life "is virtually unlimited if properly maintained," but TAPS's proven economic life will not extend past 2047 when decreased production due to declining reserves will make TAPS no longer technically and economically viable.

The superior court recognized that economic age-life calculations measure all forms of depreciation, including functional and economic obsolescence,[22] and determined that SARB's and the Department of Revenue's characterizations of economic age-life depreciation as capturing only physical depreciation was improper.  But the superior court then categorized its own economic age-life analysis as measuring only physical depreciation and made its separate deduction for economic obsolescence due to declining throughput.  Assuming that the superior court's application of a separate economic obsolescence deduction was correct, it may have double counted economic depreciation.

The court, citing State Assessor Randall Hoffbeck's testimony and *The Appraisal of Real Estate*, concludes that the superior court did not double count economic obsolescence because "while economic age-life captures more than just physical depreciation" the court is allowed to take a second look at other types of

---

[21]     APPRAISAL INST., *supra* note 5, at 420-22.

[22]     *See id.* at 420 (describing the economic age-life method as measuring "total depreciation"); *see also* AM. SOC'Y OF APPRAISERS, *supra* note 7, at 39-40 (recognizing age-to-life ratios may be used to estimate total depreciation).

obsolescence.[23] The court acknowledges that "the superior court took into account projections for declining throughput in determining economic life" but states that "the economic age-life calculation did not take into account the fact that the design capacity of the pipeline . . . is considerably greater than necessary to handle projected throughput."[24]

This is an incorrect analysis. *The Appraisal of Real Estate* provides for additional economic obsolescence depreciation only when it is not included in the economic age-life calculation.[25] But no witness, including Hoffbeck, testified that the superior court's age-life calculation excluded economic obsolescence. In fact, economic obsolescence was not excluded in the superior court's age-life calculation — because the superior court's economic age-life calculation was based entirely on declining throughput due to dwindling reserves, it already took economic obsolescence into account. And, as discussed above, TAPS's excess capacity itself does not cause a loss in value — any economic obsolescence must be due to external factors causing low throughput. Therefore the separate economic obsolescence deduction due to declining production, over and above the economic age-life depreciation deduction, may have been an erroneous double counting.

---

[23] Op. 34.

[24] Op. 34-35.

[25] APPRAISAL INST., *supra* note 5, at 423 ("[I]f external obsolescence is affecting the subject property and there are no sales in the subject market similarly affected, the appraiser can estimate total depreciation and economic life without the external obsolescence using the . . . economic age-life method and then estimate external obsolescence using techniques from the breakdown method.").

This issue was not fully presented or argued because the superior court applied its separate economic obsolescence deduction sua sponte after trial and without notice to the parties. This issue should be remanded to the superior court for further trial proceedings to determine the appropriateness of deducting for economic obsolescence based on decreased throughput after already accounting for decreased throughput when determining TAPS's economic life.

## III. CONCLUSION

In affirming the superior court's determination that the Owners are entitled to a depreciation deduction for economic obsolescence due to TAPS's low throughput, the court leaves two critical questions unanswered. If the Owners are legally and contractually required to maintain the current capacity, how can there be any form of obsolescence depreciation? And if there could be economic obsolescence based on TAPS's low throughput, what factors external to the integrated enterprise are causing the declining production and delivery to the pipeline?

I would vacate the superior court's determination that the Owners are entitled to an economic obsolescence deduction based on TAPS's excess capacity and remand for a new trial on that issue. Therefore, I respectfully dissent.